IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BOBBIE SMIRL,

       Plaintiff,                         No. CIV S-04-2543 GGH

       vs.

JO ANNE B. BARNHART,
Commissioner of Social
Security,
                                      ORDER

       Defendant.

_____/

       Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). For the reasons that follow, plaintiff's Motion for Summary Judgment or Remand is granted in part, the Commissioner's Cross Motion for Summary Judgment is denied, and the Clerk is directed to enter judgment for the plaintiff. This case is remanded for further findings pursuant to sentence four of 42 U.S.C. §405(g).

BACKGROUND

       Plaintiff, born June 15, 1956, applied on March 19, 2002 for disability benefits. (Tr. at 41.) Plaintiff alleged she was unable to work since December 10, 2001, due to breathing problems, left hand problems, stomach problems, and depression. (Tr. at 41, 47, 11.)

\\\\\

In a decision dated February 23, 2004, ALJ L. Kalei Fong determined that plaintiff was not disabled. The ALJ made the following findings:[1]

> 1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3. The claimant's recurrent major depressive disorder, fused left wrist, and chronic obstructive pulmonary disease are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).
>
> 4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:
>   Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>   Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>   Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>   Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>   Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
    The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

| | | |
|---|---|---|
| | 5. | The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision. |
| | 6. | The claimant has the following residual functional capacity: lift 20 pounds occasionally and 10 pounds frequently, walk/stand six hours, sit six hours, occasionally climb but avoid climbing ladders/ropes/scaffolds, limited forceful handling/gripping with the left hand, avoid concentrated exposure to extreme heat and pulmonary irritants, and mentally perform simple job instructions with little public contact. |
| | 7. | The claimant is unable to perform any of her past relevant work.  (20 CFR § 404.1565). |
| | 8. | The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 404.1563). |
| | 9. | The claimant has a "limited education" (20 CFR § 404.1564). |
| | 10. | The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568). |
| | 11. | The claimant has the residual functional capacity to perform substantially all of the full range of light work (20 CFR § 404.1567). |
| | 12. | Based on an exertional capacity for light work, and the claimant's age, education, and work experience, Medical-Vocational Rules 202.18 and 202.19, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled." |
| | 13. | The claimant's capacity for light work is substantially intact and has not been compromised by any nonexertional limitations.  Accordingly, using the above-cited rule(s) as a framework for decision-making, the claimant is not disabled. |
| | 14. | The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)). |

(Tr. at 20-21.)

\\\\\

\\\\\

ISSUES PRESENTED

Plaintiff has raised the following issues: (A) Whether the ALJ Erred in Not Giving Controlling Weight to Plaintiff's Treating Physicians; (B) Whether the ALJ Properly Assessed Plaintiff's Credibility; and (C) Whether the ALJ Should Have Used the Testimony of a Vocational Expert in Determining Plaintiff's Residual Functional Capacity.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

ANALYSIS

Whether the ALJ Erred in Rejecting the Opinion of Plaintiff's Treating Physicians

Plaintiff contends that the ALJ failed to give controlling weight to plaintiff's treating physicians, Dr. Hsii, plaintiff's primary care physician, Dr. Sonik, a pulmonary specialist, and Dr. Regazzi, who diagnosed depression.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246

\\\\\

4

F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[2]  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons.  Lester, 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001),[3] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is

---

[2] The regulations differentiate between opinions from "acceptable medical sources" and "other sources."  See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources."  Id.  Medical opinions from "acceptable medical sources," have the same status when assessing weight.  See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific regulations exist for weighing opinions from "other sources."  Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

[3] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

insufficient to reject the opinion of a treating or examining professional. Lester, 81 F.3d at 831.

Plaintiff contends that the ALJ erred in rejecting Dr. Regazzi's opinion regarding plaintiff's mental state. First of all, this psychologist evaluated plaintiff at the request of her attorney, and was not a treating physician. She diagnosed plaintiff with major depressive disorder, and assigned a GAF of 55.[4]

Of the various tests administered, the MMPI-2 test produced an extremely high result on the Infrequency Scale that was of questionable validity, and which the psychologist could not explain, other than to say it could mean malingering, confusion, a plea for help, or marginal reading ability. She acknowledged it could not have been based on a lack of understanding the instructions on the test because plaintiff's reading ability was at college level. (Id. at 195, 194.) Dr. Regazzi thought in this case plaintiff was exaggerating her symptoms as a cry for help. Dr. Regazzi thought plaintiff's depression would interfere with her ability to meet the basic demands of work, including reliable attendance, motivation, work productivity, emotional stability, and initiative. Nevertheless, she thought plaintiff could understand and carry out simple and complex instructions, could interact appropriately with others and verbally express her thoughts, and could read, write and organize skillfully. (Id. at 196.)

The ALJ rejected these limitations because:

> they are inconsistent with the psychiatric CE and functional assessment by Dr. Tyle; they are inconsistent with the SA determination; they appear inconsistent with the doctor's opinion that the claimant was capable of carrying out her personal and daily living activities as they would require the same basic demands of most work environments; Kaiser records beginning in 2001 do not contain findings to support of [sic] Dr. Regazzi's functional limitations ...; there is no evidence of any individual or group therapy; there is no evidence of any hospitalizations or crisis center

---

[4] GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1994) ("DSM IV"). According to the DSM IV, a GAF of 51 to 60 indicates moderate symptoms such as flat affect, circumstantial speech, occasional panic attacks, or moderate difficulty in functioning as in few friends or conflicts with peers or co-workers.

6

contacts; and no mental difficulties were observed when she filed her application.

(Id. at 14.)

The ALJ relied instead on the opinion of Dr. Tyl, a psychiatrist who had the benefit of plaintiff's medical records. Plaintiff reported that she didn't know why she was sent to Dr. Tyl, other than because she was taking Prozac. She complained that her problems were physical in nature, and that she was not working because of her lungs and heart. (Id. at 152.) Plaintiff was diagnosed with major depressive episode and a GAF of 60. (Id.) Dr. Tyl thought plaintiff did well on calculations, had good attention and judgment, could perform simple tasks, and follow directions. Dr. Tyl also noted plaintiff's daily activities and that she was active in caring for her grandsons and doing housework. (Id. at 153.)

This opinion is consistent with a DDS psychiatric assessment, dated July 9, 2002, which found that plaintiff could remember locations and work-like procedures, understand and remember simple and detailed instructions, carry out short and simple instructions, maintain a regular work schedule and routine without special supervision, complete a work week, perform at a consistent pace without an unusual number of rest periods, ask simple questions, accept instructions, respond appropriately to criticism, and get along with coworkers. Plaintiff would have moderate limitations in carrying out detailed instructions, maintaining attention and concentration for extended periods, working with others without being distracted, interacting appropriately with the general public, and responding appropriately to changes in the work setting. (Tr. at 154-55.) These findings were based on depression which limited plaintiff to simple tasks with little public contact.[5] (Id. at 156.)

\\\\\

---

[5] Another less complete DDS psychiatric assessment, dated November 5, 2002, found that plaintiff had depressive syndrome, and as a result had moderate restriction in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. at 161, 168.)

The ALJ correctly relied on the opinions of Dr. Tyl and the DDS psychiatric assessment of July 9, 2002. Moreover, plaintiff was not seeking treatment for her depression, which indicates it was of diminished severity. Moreover, the benefits at issue here are for long term "permanent" disability. Many persons have depression and many persons are successfully treated. A psychologist's one time testing, without records of any significant past treatment or problems, with the resultant opinion that plaintiff's depression was essentially incurable, unmitigatible and relatively permanent, is beyond any credible assertion.

Although she was not required to do so, the ALJ gave specific and legitimate reasons to reject Dr. Regazzi based on substantial evidence in the record, and her opinion in this regard will not be disturbed.

In regard to Drs. Hsii and Sonik, the ALJ did not refer to them by name in his decision; however, he did refer to diagnostic records ordered by these physicians and explained why they supported his decision. A March 20, 2002, x-ray taken for plaintiff's abdominal distension showed no masses or obstruction, and there was no acute process identified. (Tr. at 123.) A chest x-ray on March 11, 2002 showed no acute process. Compared to earlier x-rays from January 16, 2002 and November 16, 1998, there was no significant change. "A very mild generalized increase in insterstitial markings is stable, probably reflecting an element of chronic lung disease. Pleural thickening along the right lateral chest is unchanged." (Id. at 124.) An echocardiography report from January 28, 2002 indicated normal. (Id. at 129.) An esophagram on January 18, 2002 was negative. (Id. at 133.) A chest x-ray on January 16, 2002 was normal. (Id. at 134.) On at least two occasions, Dr. Sonik noted that plaintiff was still smoking and advised her to quit, based on his diagnosis of chronic obstructive pulmonary disease ("COPD,") based on asthmatic bronchitis. (Id. at 132, 135.) Plaintiff's medications were albuterol, Atrovent, Prozac, and prednizone. (Tr. at 117.) The ALJ cited to all these diagnostic findings, but made no mention of the treating records. Significantly in regard to the March 11, 2002 chest x-ray, the ALJ only mentioned that it showed no acute process when in fact it also included the

8

afore-mentioned summary regarding pleural thickening and chronic lung disease. (Tr. at 13.) The ALJ failed to analyze these latter findings.

One of the problems with the treating notes of these physicians is that they are for the most part illegible. The two typewritten notes referred to by plaintiff which indicate that plaintiff could not return to work advise that plaintiff be precluded from working for six to seven months due to her COPD, with this preclusion lasting from June or July, 2002 only until January, 2003.[6] (Tr. at 478, 481.) The ALJ based his finding of lack of disability in part on the lack of evidence that plaintiff's condition was expected to last for twelve continuous months. Plaintiff asserts that one document states her condition lasted one year; however, this statement was filled out and signed by plaintiff only. (Tr. at 479.) Nevertheless, the fact that Dr. Hsii precluded plaintiff from working from June or July, 2002 until December or January, 2003 indicates that her condition is more serious than the ALJ describes.

Defendant correctly points out that these advisements pertained to plaintiff's past work at a steel mill which she admits contributed to her breathing problems. (Id. at 492-93.) The ALJ took these limitations into consideration when she limited plaintiff to work which was not in an environment with pulmonary irritants or extreme heat. (Tr. at 18.) Yet the record is not complete enough for the ALJ to make this determination for the following reasons.

These two pages indicating a preclusion from work have not been submitted with any supporting documentation. A review of the entire record indicates only one reference to any diagnostic test for COPD. In January, 2002, a handwritten notes states "PFT: mild airway obst.; [decrease] DLCO5=61, but corrects to 94% with [] volume correction." (Tr. at 132.) The actual pulmonary function test does not appear to be in the record. Of all the diagnostic tests available to diagnose this disease, there does not seem to be evidence that any of them were performed. See www.nhlbi.nih.gov (recommending spirometry test as most common of pulmonary function

---

[6] These notes were signed by Dr. Hsii.

9

1   tests, and noting other tests available for COPD).  Furthermore, there is no more specific
2   diagnosis, such as whether the COPD is mild, moderate or severe, which would give insight into
3   plaintiff's functional capacity.  Id. (noting that with mild COPD, a person may not be aware that
4   airflow into the lungs is reduced; with moderate COPD, breathing test indicates worsening
5   airflow limitation and medical attention is usually sought; with severe COPD, test shows severe
6   airflow limitation and quality of and threat to life is impaired).  Additionally, the handwritten
7   notation regarding the severity of the COPD is confusing because although the score is 61, the
8   percentage of 94 is much higher with correction.  The significance of this notation is unclear to
9   the layperson.

10            Numerous progress notes do not indicate any exam of the respiratory functions.
11  In fact, forms with check mark boxes are left blank, indicating that no exam was performed.  (Tr.
12  at 121, 125, 127.)  In one instance, it was noted that plaintiff was "feeling much better" but still
13  had mild shortness of breath.  This and other notations do not include any exam of the chest or
14  lungs.  (Id. at 121.)

15            Furthermore, Dr. O'Brien, upon whom the ALJ relied, left many questions
16  unanswered in her report.  This consultant examined plaintiff on May 14, 2002, without the
17  benefit of medical records.  This lack of history raised more questions than it answered.  She
18  noted that COPD was diagnosed in 1999, according to plaintiff's report.  (Tr. at 147.)  She added,
19  "[r]egrettably I do not have a pulmonary function test or other old medical records to review."
20  (Id.)  Dr. O'Brien did not perform any pulmonary function tests herself.  Significantly, this
21  internist then assessed plaintiff's functional capacity: "client should be able to stand and walk 6
22  hours in an 8-hour workday with appropriate breaks, unless PFT or other old medical records
23  reveal moderate or severe COPD in which case this estimate would be adjusted downward."
24  (Id.)  Dr. O'Brien also thought that plaintiff's lifting and carrying capacity would need to be
25  adjusted downward if objective testing were to show moderate or severe COPD.  (Id.)  In
26  addition, she found plaintiff could sit for six hours and was limited to occasionally reaching and

handling on the left only.  There were no other limitations, other than limiting the physical environment to one containing no smoke, fumes, or dust based on plaintiff's history of COPD. Dr. O'Brien conceded she had a lack of information concerning the degree of COPD.  As a result, her findings are conditional and uncertain.  Her report, along with the record before the court, indicates that there is not enough evidence in the file concerning COPD.

The ALJ discussed plaintiff's COPD at length in regard to his finding that she did not meet the listings, yet he referred to scores which do not appear to be reflected in the record. For example, he stated that there is no medical evidence of "chronic impairment of gas exchange due to clinically documented pulmonary disease with single breath DLCO less than 10.5 ml/min/mm Hg or less than 40 percent of predicted normal value," yet the one reference to DLCO in the record lists it at 61.  (Tr. at 14, 132.)  He also finds that plaintiff's FEV1 (forced expiratory volume in one second) level is not less than the values described in Table 1, but this court could not locate any FEV1 measurement in the records.  Furthermore, although the ALJ noted there was minimal treatment for COPD, it appears that plaintiff received ongoing medications to control the symptoms over a long period of time.  Whether the medications in fact controlled the symptoms or affected plaintiff's functional capacity is unknown.  Therefore, remand is necessary to further develop the record in regard to the severity of plaintiff's COPD and its effect on her functional capacity.

Finally, the ALJ pointedly referred to plaintiff's failure to quit smoking despite her physician's warnings as a ground to deny benefits.  (Tr. at 15.)  Although courts are split over this issue, in this case, due to plaintiff's addiction to smoking, it is impermissible to draw any conclusion from it.  Rousey v. Heckler, 771 F.2d 1065, 1069 (7th Cir. 1985).  The ALJ in that case had assumed that if plaintiff quit smoking, her COPD would be reduced to a non-severe status; however, the court found no evidence from which to draw this conclusion.  The court also rejected the notion that plaintiff was not credible in regard to her complaints of pain because no medical evidence linked her chest pain to her smoking, and because smoking is so addictive it is

11

impossible to infer that a person is not suffering from a disease but in reality cannot quit smoking. Id. at 1070. See also Byrnes v. Shalala, 60 F.3d 639 (9th Cir. 1995) (noting that before ALJ can deny benefits for noncompliance with prescribed treatment such as smoking, he must consider whether impairment is reasonably remediable by the individual claimant). But see Henry v. Gardner, 381 F.2d 191 (6th Cir. 1967) (finding presently treatable conditions not susceptible to being characterized as long term disability).

> Failure to quit smoking has been held to be a justifiable grounds for refusing benefits. E.g., Henry v. Gardner, 381 F.2d 191 (6th Cir.1967); Hirst v. Gardner, 365 F.2d 125 (7th Cir.1966). However, some recent cases have held that benefits cannot be denied for failure to stop smoking absent a finding that the claimant could voluntarily stop smoking (i.e., was not addicted to cigarettes). Monteer v. Schweiker, 551 F. Supp. 384, 390 (W.D.Mo.1982); Caprin v. Harris, 511 F. Supp. 589, 590 (N.D.N.Y.1981). Smoking, like alcohol abuse, can be an involuntary act for some persons. We believe that allegations of tobacco abuse should be treated in the same fashion as allegations of alcohol abuse.

Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984). The court held that on remand, benefits could only be denied if there was a finding that a physician had prescribed cessation of smoking, and the claimant was able to voluntarily stop. (Id.)

The ALJ's analysis was also erroneous in regard to plaintiff's smoking. Based on the aforementioned questions raised in regard to plaintiff's COPD, remand is required for further development of the record.

The court will not address the ALJ's credibility determination at this time, other than to caution the ALJ to conduct any credibility determination in accordance with Ninth Circuit requirements, especially in regard to the significance of smoking and failure to quit smoking.[7]

\\\\\
\\\\\

---

[7] The issue of whether a vocational expert should have been called is also not appropriate for decision at this time.

CONCLUSION

Accordingly, IT IS ORDERED that plaintiff's Motion for Summary Judgment or Remand is GRANTED in part pursuant to Sentence Four of 42 U.S.C. § 405(g), the Commissioner's Cross Motion for Summary Judgment is DENIED, and this matter is remanded for further work-up.  The Clerk is directed to enter judgment for the plaintiff.

DATED: 2/14/06

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Smirl2543.ss.wpd